AO 440 (Rev 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

_____ Southern _____ DISTRICT OF _____ New York _____

ANGEL AVILA (AND WIFE, AMMSY AVILA)

## SUMMONS IN A CIVIL CASE

V.

CASE NUMBER:

BROOKFIELD FINANCIAL PROPERTIES, INC.,
VERIZON NEW YORK, INC., WFP TOWER
A. CO., L.P.,

## 07 CV 060

TO: (Name and address of defendant)
Brookfield Financial Properties, Inc.
1 Liberty Plaza, 165 Broadway
New York, NY 10006

Judge Hellerstein

WFP Tower A. Co., L.P.
1 Liberty Plaza, 165 Broadway
New York, NY 10006

Verizon New York, Inc.
1095 Avenue of the Americas
New York, NY 10036-

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

WORBY GRONER EDELMAN & NAPOLI BERN, LLP
115 Broadway, 12th Floor
New York, New York 10006
212-267-3700

an answer to the complaint which is herewith served upon you, within _____ 30 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

CLERK

_____

_____

DATE

_____

(BY) DEPUTY CLERK

AO 440 (Rev 10/93) Summons in a Civil Action - SDNY WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me | |

| NAME OF SERVER (PRINT) | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
Date                                                                        Signature of Server

_____
Address of Server

(1)   As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CV 060

------------------------------------------------------------X

IN RE WORLD TRADE CENTER SITE LITIGATION

------------------------------------------------------------

ANGEL AVILA AND AMMSY AVILA,

                                  Plaintiff,

         - against: -

BROOKFIELD FINANCIAL PROPERTIES, INC.,
VERIZON NEW YORK, INC., WFP TOWER
A. CO., L.P.,

                         Defendants.

------------------------------------------------------------X

Civil Action No:

COMPLAINT

Plaintiff Demands A
Trial By Jury

21 MC 102 (AKH)

RECEIVED
JAN 03 2007
USDC SD N.Y.
CASHIERS

Plaintiff, ANGEL AVILA, by his attorneys WORBY GRONER EDELMAN & NAPOLI

BERN, LLP., complaining of defendants respectfully alleges:

The Plaintiff, Angel Avila, a citizen of the State of New York, residing at 45-31 43rd

Street, Apt.B, Sunnyside, New York 11104 brings this action against Defendants Brookfield

Financial Properties, Inc., Verizon New York, Inc., WFP Tower A. Co., L.P., ("Avila

Defendants") seeking redress for injuries suffered in the past, and will continue to suffer, as a

result of participation in the vicinity of World Trade Center site in the aftermath of September

11, 2001.

Plaintiff, AMMSY AVILA, hereinafter ("Derivative Plaintiff"), is a citizen of New York

residing at 45-31 43rd Street, Apt.B, Sunnyside, New York 11104, and has been the spouse at all

relevant times herein, is and has been lawfully married to Plaintiff ANGEL AVILA, and brings

this derivative action for her (his) loss due to the injuries sustained by her husband (his wife),

Plaintiff ANGEL AVILA.

## I. DEFINITIONS

The following definitions are employed for the purposes of this Complaint, and any

subsequent Complaints filed hereunder, unless otherwise specified:

1.      "Operations" includes cleaning, debris removal, carting, excavation and abatement

of hazardous substances performed at the Work Locations identified in paragraph 11.

2.      "Work" includes all activities undertaken by Plaintiff as part of his operations at his

Work Locations and in and around the World Trade Center site.

3.      "Hazardous substances" include but are not limited to, substances that have toxic,

carcinogenic, teratogenic, and mutagenic effects on bodily systems. Hazardous substances

present at Plaintiff's Work Locations were and are in the form of dust, fumes, particulate

matter, vapors, gases, mists, fibers and liquids.  The specific hazardous substances Plaintiff

was exposed to include, but are not limited to, asbestos, fiberglass, crushed glass, silica,

pulverized concrete, lead, mercury, cadmium, chromium, beryllium, iron, aluminum and other

heavy metals, poly chlorinated biphenyls (PCBs), dioxin compounds, furons, Freon

compounds, poly cyclical aromatic hydrocarbons (PAHs), benzene and other volatile organic

compounds, arsenic, sulfur, acidic aerosols, and other toxic substances and hazardous

decomposition by-products.

## II. INTRODUCTION

4.      Upon the collapse of the Twin Towers and Seven World Trade Center, known and

unknown toxic substances were spread throughout the World Trade Center Site and the surrounding

areas, portions of which, were owned, operated, maintained, controlled, supervised, and/or managed

by the Avila Defendants.  Those areas remained dangerous, defective, hazardous, toxic, unguarded,

unsupervised, and unprotected for multiple days, weeks, and/or months thereafter. Plaintiff

participated in debris removal and/or, hazardous substance abatement, and/or cleaning of buildings

in the immediate vicinity of the World Trade Center Site beginning on or about September 15, 2001 through on or about September 7, 2002.

5.      The nature of this action is to recover money damages for the personal injuries sustained by the Plaintiff as a result of the carelessness, recklessness and negligence of Defendants in failing to provide the Plaintiff with a safe place to work in failing to provide the Plaintiff with proper, appropriate, and legally required respiratory protection, personal protective equipment, decontamination equipment and procedures, and training to prevent exposure to hazardous substances at his Work Locations.

6.      Plaintiff also seeks recovery for the Avila Defendants' failure to provide appropriate respiratory protection and appropriate protective clothing and equipment, and to properly monitor air quality and to notify the Plaintiff of the dangerous levels of toxins and contaminants in the air at the Work Locations.  Plaintiff also seeks recovery for the Avila Defendants' failure to comply with one or more of the following: the World Trade Center Environmental Health and Safety Plan(s); the Labor Law of the State of New York; the New York State Industrial Code; the requirements of the Occupational Safety & Health Administration; and other applicable federal, state and local statutes, law, rules, regulations and ordinances.

## III. JURISDICTION

7.      The United States District Court for the Southern District of New York has original jurisdiction over the Plaintiff's claims pursuant to §408(b)(1) of the Air Transportation Safety & System Stabilization Act of 2001, 49 U.S.C. §40101 ("the Act").

## IV. VENUE

8.    Pursuant to the Act, venue is proper in this judicial district.

## V. PARTIES

### THE PLAINTIFF(S)

9.    Plaintiff participated in the clean up, debris removal, hazardous substance abatement, maintenance and/or repair work in vicinity of the World Trade Center Site at the locations identified in Paragraph 11 beginning on or about September 15, 2001 through on or about September 7, 2002.

10.    Derivative Plaintiff brings this derivative action for her loss due to the injuries sustained by her husband, Plaintiff ANGEL AVILA.

11.    Beginning on or about September 15, 2001 through on or about September 7, 2002, upon information and belief, plaintiff was employed in work within and/or outside the following locations, collectively known as the "Work Locations":

    a.    1 World Financial Center, 200 Liberty Street, New York, NY10281

    b.    "Verizon Building": 140 West Street, New York, NY10007

12.    Plaintiff sustained serious physical illnesses and injuries as a result of exposure to hazardous substances during his work at the Work Locations.

13.    Plaintiff's injuries are as a result of exposure to hazardous substances at the Work Locations which include, but are not limited to, the following:

    a.    Sinus Problems

    b.    Chronic Headaches

    c.    Respiratory Problems: Cough, Shortness of Breath

     d.   Sleeping Problems

     e.   Chest Pain

14.    Plaintiff or Plaintiff's physicians did not become aware of the foregoing injuries until on or about January 1, 2004.

### THE DEFENDANT(S)

15.    Upon information and belief, at all times herein mentioned, Defendant Verizon New York, Inc. was and is located at 140 West St., New York, New York, 10007.

16.    At all times herein mentioned, Defendant Verizon New York, Inc. owned the premises at 140 West St., New York, New York, 10007.

17.    At all times herein mentioned, Defendant Verizon New York, Inc. leased the premises at 140 West St., New York, New York, 10007.

18.    At all times herein mentioned, Defendant Verizon New York, Inc. managed the premises at 140 West St., New York, New York, 10007.

19.    At all times herein mentioned, Defendant Verizon New York, Inc. controlled the premises at 140 West St., New York, New York, 10007.

20.    At all times herein mentioned, Defendant Verizon New York, Inc. supervised the premises at 140 West St., New York, New York, 10007.

21.    At all times herein mentioned, Defendant Verizon New York, Inc. maintained the premises at 140 West St., New York, New York, 10007.

22.    Upon information and belief, at all relevant times Defendant Brookfield Financial Properties, Inc. was and is located at 1 Liberty Plaza, 165 Broadway, New York, New York 10006.

23.    Upon information and belief, at all relevant times, Defendant WFP Tower A Co., LP was and is located at 1 Liberty Plaza, 165 Broadway, New York, New York 10006.

24.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. owned the premises at 1 World Financial Center, New York, New York.

25.     At all times herein mentioned, Defendant WFP Tower A Co., LP owned the premises at 1 World Financial Center, New York, New York.

26.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. leased the premises at 1 World Financial Center, New York, New York.

27.     At all times herein mentioned, Defendant WFP Tower A Co., LP leased the premises at 1 World Financial Center, New York, New York.

28.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. managed the premises at 1 World Financial Center, New York, New York.

29.     At all times herein mentioned, Defendant WFP Tower A Co., LP managed the premises at 1 World Financial Center, New York, New York.

30.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. controlled the premises at 1 World Financial Center, New York, New York.

31.     At all times herein mentioned, Defendant WFP Tower A Co., LP controlled the premises at 1 World Financial Center, New York, New York.

32.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. supervised the premises at 1 World Financial Center, New York, New York.

33.     At all times herein mentioned, Defendant WFP Tower A Co., LP supervised the premises at 1 World Financial Center, New York, New York.

34.     At all times herein mentioned, Defendant Brookfield Financial Properties, Inc. maintained the premises at 1 World Financial Center, New York, New York.

35.     At all times herein mentioned, Defendant WFP Tower A Co., LP maintained the premises at 1 World Financial Center, New York, New York.

36.     Brookfield Financial Properties, Inc. was and is a duly organized foreign business corporation transacting business in the State of New York.

37.     WFP Tower A Co., L.P. was and is a duly organized foreign limited partnership transacting business in the State of New York.

38.     Verizon New York, Inc. was and is a duly organized domestic business corporation transacting business in the State of New York.

39.     Brookfield Financial Properties, Inc. does and/or solicits business within the State of New York.

40.     WFP Tower A Co., L.P. does and/or solicits business within the State of New York.

41.     Verizon New York, Inc. does and/or solicits business within the State of New York.

42.     Brookfield Financial Properties, Inc. derives substantial revenue from goods used or consumed or services rendered in the State of New York, and expect or should have expected their acts and business activities to have consequences within the State of New York.

43.     WFP Tower A Co., L.P derives substantial revenue from goods used or consumed or services rendered in the State of New York, and expect or should have expected their acts and business activities to have consequences within the State of New York

44.     Verizon New York, Inc. derives substantial revenue from goods used or consumed or services rendered in the State of New York, and expect or should have expected their acts and business activities to have consequences within the State of New York

45.     After September 11, 2001, the Avila Defendants acted in their capacity as general contractors, and/or subcontractors, and/or construction manager responsible for the demolition,

planning, reconstruction, renovation, debris removal, hazardous substance abatement and/or alteration performed at their respective buildings.

46.    After September 11, 2001, Brookfield Financial Properties, Inc., Verizon New York, Inc., WFP Tower A. Co., L.P. employed their own employees, construction companies, engineers, managers, contractors and subcontractors responsible for demolition, construction, renovation, alteration, and all work performed at their respective buildings.

## VI. GENERAL ALLEGATIONS

47.    This case arises out of injuries the Plaintiff sustained while working at the Work Locations in the aftermath of the terrorist attacks of September 11, 2001.

### A. General Conditions At World Trade Center Site

48.    Before September 11, 2001, the buildings at the WTC generated large amounts of hazardous waste, as defined by the Resource Conservation and Recovery Act (RCRA), producing over 10,000 pounds of hazardous waste per year. The buildings contained thousands of computers, fluorescent light fixtures, stored chemicals, underground and above ground storage tanks holding tons of diesel fuel and fuel oil, electrical transformers laden with PCB-containing oil, asbestos, and other hazardous substances.[1]  Defendants knew that the collapse of these buildings would release these toxic substances, presenting a grave health risk to all who were exposed.

49.    Following the collapse of the World Trade Center buildings on September 11, 2001, there existed a dangerous, defective, hazardous, unguarded, unsupervised, unprotected, and unsafe toxic condition at the World Trade Center Site and Work Locations.

---

[1] See Burton Transcript, at pp. 49-51.

50.    The air and the area in, around, on, and at the World Trade Center Site, including the Plaintiff's Work Locations was polluted and contaminated with toxic hazardous substances.

51.    Workers were exposed to enormous quantities of toxic, carcinogenic, mutagenic, and teratogenic hazardous substances, generated by the collapse of the WTC buildings and smoldering fires that lasted more than three months, reaching temperatures as high as 1800° Fahrenheit.[2]

52.    The ongoing fires burning at the World Trade Center Site produced a mixture of toxic gases and ultra-fine particulates. Air samples taken from a rooftop one mile north of the World Trade Center Site showed "unprecedented ambient levels" of fine particulate matter, sulfur, acidic aerosols, heavy metals, and other dangerous compounds.[3]

53.    The levels and types of human exposures resulting from this mixture of materials, dust, toxins, and a smoldering fire that lasted more than three months and reached temperatures as high as 1800° Fahrenheit was unprecedented.[4] Dust and vapors blanketed work site, as well as, the entire area surrounding the World Trade Center Site, including Work Locations. The ongoing fires burning at the World Trade Center Site produced a mixture of toxic gases and ultra-fine particulates that had never before been seen. Air samples taken from a rooftop one

---

[2] Paul J. Lioy, "Characterization of the Dust Smoke Aerosol that Settled East of the World Trade Center in Lower Manhattan After the Collapse of the WTC 11 September, 2001, "Envtl. Health Perspectives 110(7):703-14 (July 2002), p. 703.

[3] Thomas Cahill, et al., "Analysis of Aerosols from the World Trade Center Collapse Site, New York October 2 to October 30, 2001," Aersol Sci., & Tech. 38:165-183 (2004) p. 182; Laurie Garrett, "A 'Chemical Factor' in Skies," New York Newsday (September 11, 2003). Dr. Cahill took more than 8,000 air samples, starting October 3, 2001, from a rooftop on Varick Street in Manhattan.

[4] Paul J. Lioy, "Characterization of the Dust Smoke Aerosol that Settled East of the World Trade Center in Lower Manhattan After the Collapse of the WTC 11 September, 2001, "Envtl. Health Perspectives 110(7):703-14 (July 2002), p. 703.

mile north of the World Trade Center Site showed "unprecedented ambient levels" of fine particulate matter, sulfur, acidic aerosols, heavy metals, and other dangerous compounds.[5]

54.     The Avila Defendants, through their employees, representatives, agents, contractors, and other entities, knew that protection from hazardous substances was necessary at Plaintiff's Work Locations.[6]

55.     The official Report of the City Council Committee on Environmental Protection acknowledged: "In the weeks following the collapse of the Twin Towers, significant quantities of smoke, dust, asbestos, silica, dioxins, polychlorinated biphenyls (PCBs), lead, mercury, cadmium and other heavy metals, furans, volatile organic compounds, polycyclical aromatic hydrocarbons, benzene[7] and various other potentially hazardous substances were released into the air."[8]

56.     Upon information and belief, the Avila Defendants knew that exposure to these harmful substances could cause a plethora of health problems for the WTC workers.

57.     Upon information and belief, the Avila Defendants were aware that exposure to carbon monoxide could cause chronic angina and cardiac dysfunction.

---

[5] Thomas Cahill, *et al.*, "Analysis of Aerosols from the World Trade Center Collapse Site, New York October 2 to October 30, 2001," *Aerosol Sci., & Tech.* 38: 165-183 (2004) p. 182; Laurie Garrett, "A 'Chemical Factor' in Skies," *New York Newsday* (September 11, 2003). Dr. Cahill took more than 8,000 air samples, starting October 3, 2001, from a rooftop on Varick Street in Manhattan.

[6] On September 21, 2001 and October 19, 2001, the City DOH, through the Commissioner of Health, issued two orders. These orders established controls on building use by City personnel and mandated specific protective actions be taken when persons and vehicles left the WTC Site. "It is hereby ordered that all persons leaving the WTC site shall follow personal hygiene protocols, including but not limited to ... removal or HEPA vacuuming of work clothes... It is further ordered that all vehicles leaving the WTC site be spray washed ... *See* CITYCM3-0002631718 and 0004199697. City DOH Orders of 10 19 01 and 9 21 01. Notably, these protocols were NOT followed or enforced.

[7] *See* OSHA-NY00045060: "Air samples taken within the plume have contained high mixtures, at times, of compounds like benzene, which has been linked - for long term exposures - to anemia and leukemia."

[8] *See* CITY CM3-000025293: *Air Quality and Environmental Impacts Due to the WTC Disaster*, December 2001.

58.    Upon information and belief, the Avila Defendants were aware that exposure to chromium metal and insoluble salts could cause chronic nasal septum perfection, liver and kidney damage, as well as cancer.

59.    Upon information and belief, the Avila Defendants were aware that exposure to Crystalline Silica (as respirable dust) could cause progressive respiratory symptoms, silicosis and cancer.

60.    Upon information and belief, the Avila Defendants were aware that exposure to Freon (R-22) could cause cardiac arrhythmia, cardiac arrest and asphyxiation.

61.    Upon information and belief, the Avila Defendants were aware that exposure to Lead (metallic and inorganic) is linked to decreases in muscle strength, abdominal pain, severe constipation, nausea, vomiting, paralysis of the wrist joint, kidney damage and nervous system disorders.

62.    Upon information and belief, the Avila Defendants were aware that exposure to mercury compounds could cause pneumonitis, tremor and gastrointestinal distress.

63.    Upon information and belief, the Avila Defendants were aware that exposure to PCBs could cause chemical acne, black heads, dark patches on skin, liver damage, digestive disturbances, impairment of the immune system and cancer.

64.    Information as to the hazardous conditions present at Plaintiff's Work Locations and the toxic exposures were never communicated to workers or to treating physicians. [9]

65.    From the time of the collapse of the buildings on September 11, 2001, and continuously thereafter, the Avila Defendants were aware of the danger posed to Plaintiff and all

---

[9] *See* February 21, 2002 EPA National Ombudsman First Investigative Hearing on WTC Hazardous Waste Contamination. Experts and private citizens testified that the federal government, state government and city government had (1) not been operating in compliance with the laws of the United States, and (2) had been providing the public, firemen and police officers with erroneous information..

others lawfully present at the Work Locations by exposure to toxins, hazardous substances, particulate matter and contaminants in the air and on surfaces.

66.    The ongoing fires burning at the WTC Site produced a mixture of toxic gases, fumes, vapors and ultra-fine particulates. Indeed, air samples taken from a rooftop one mile north of the WTC Site demonstrated "unprecedented ambient levels" of fine particulate matter, sulfur, acidic aerosols, heavy metals, and other dangerous compounds.[10]

67.    Shortly after September 11, 2001, tests conducted by the United States Geological Survey ("USGS") determined that the dust at the WTC Site was highly caustic, with a demonstrated capacity of burning tissue in the throat, eyes, and nasal passages. The dust was determined to have a pH value of 9.0 to 11.0, indicating that the dust was highly alkaline and comparable to ammonia. Some of the dust samples taken by the USGS on September 17-18, 2001, registered higher than 11.0 on the pH scale—this level was as caustic as liquid drain cleaners.[11]

68.    Days after September 11, 2001, the New York Environmental Law & Justice Project sent dust samples from several lower Manhattan locations to two respected laboratories. One such sample showed a 90% fiberglass content.[12] Fiberglass consists of glass fibers that are small enough to be inhaled and cause respiratory irritation in humans and fibrosis (a scaring or thickening of tissues deep in the lung, impairing respiration) in animals. Glass fibers are also highly irritating to the eyes.

---

[10] *See* Thomas Cahill, *et al.*, "Analysis of Aerosols from the WTC Collapse Site, New York October 2 to October 30, 2001," *Aerosol Sci. & Tech.* 38:165-183 (2004) p. 182; Laurie Garrett, "A 'Chemical Factor' in Skies", *New York Newsday* (September 11, 2003). Dr. Cahill took more than 8,000 air samples, starting October 3, 2001, from a rooftop on Varick Street in Manhattan.

[11] *See* Clark, *et al.*, "Environmental Studies of the WTC Area After the September 11, 2001 Attack" (USGS Open File Report OFR-01-0129) (http://pubs.usgs.gov of 2001 ofr-01-0429 >), p 4; Philip Landrigan, M.D., *et al*, "Heath and Environmental Consequences of the WTC Disaster," *Envtl Health Perspectives* 112(6):73139, 732 (May 2004), at p 16.

[12] Juan Gonzalez, "Health Hazards in Air World Trade Center Workers," *Daily News* (September 28, 2001); Juan Gonzalez, *Fallout*, p. 6. The sample was taken at the corner of Church and Vesey Streets, at the northeast corner of the WTC Site.

69.     The New York City Department of Environmental Protection ("NYDEP") conducted numerous tests that determined that the air and World Trade Center Site was contaminated and polluted with the aforementioned toxic Dust.

70.     Shortly after September 11, 2001, tests conducted by the United States Geological Survey ("USGS") determined that the dust at the World Trade Center Site was highly caustic and thus capable of burning moist tissue in the throat, eyes, and nasal passage. This dust was determined to have a pH value of 9.0 to 11.0, indicating that the dust was highly alkaline and comparable to ammonia. Some of the dust samples taken by the USGS on September 17-18, 2001, registered higher than 11.0 on the pH scale—as caustic as liquid drain cleaners.[13]

### Lack of Worker Safety

71.     The Avila Defendants, their employees, representatives, agents, and/or contractors failed to provide Plaintiff with a safe and healthy work place, the required personal protective equipment, including respiratory protection, chemical impervious clothing, decontamination facilities, hazardous materials training, respiratory fit testing and proper medical surveillance.

72.     The Avila Defendants, their employees, representatives, agents, and/or contractors failed to perform the required atmospheric monitoring in and around the WTC site and Plaintiff's Work Locations. Any atmospheric monitoring performed by the Avila Defendants was inadequate to identify the true extent of the risk faced by the Plaintiff and to provide adequate information from which to determine the proper protective measures and equipment needed to adequately protect the health and safety of the Plaintiff.

73.     The Avila Defendants, their employees, representatives, agents, and/or contractors on their own, failed to implement and adopt the appropriate testing, sampling and monitoring

---

[13] Roger Clark, *et al.*, "Environmental Studies of the World Trade Center Area After the September 11, 2001 Attack" (USGS Open File Report OFR-01-0129) (http:/pubs.usgs.gov of 2001 ofr-01-0429 >), p.4; Philip Landrigan, M.D., *et al.*, "Heath and Environmental Consequences of the World Trade Center Disaster, *Envtl Health Perspectives* 112(6):73139, 732 (May 2004), at p.16.

methods, protocols, and/or procedures that they were legally mandated to perform to properly identify, characterize, and quantify the nature and concentration of hazardous substances Plaintiff was exposed to at his Work Locations.

74.     The Avila Defendants, their employees, representatives, agents, and/or contractors on their own, incorrectly tested samples and analyzed and evaluated atmospheric conditions by the use of faulty tests.

75.     The analytical data, if properly evaluated, would have revealed that there were dangerously high concentrations of total volatile organic compounds, including but not limited to benzene, that far exceeded the protection limits provided by air purifying cartridge respirators. These levels required, instead, supplied air and self-contained breathing apparatus (SCBA).

76.     Benzene levels alone required the use of Level A or B personal protective equipment, including self-contained breathing apparatus and respirator fit tests, as required by the OSHA HAZWOPER standard, 29 CFR 1910.120.  Plaintiff should have been fully encapsulated to prevent dermal exposures to hazardous substances. Accordingly, the Plaintiff was not provided with timely or adequate warnings about the dangers that existed at his Work Locations.

77.     Plaintiff was not provided with or required to use personal protective equipment and/or other safety equipment necessary to provide adequate protection against the dangers at her Work Locations.  Among other things:

          (a)     Plaintiff was not provided with, or required to use, the necessary and
          legally mandated respiratory protection while working in and around the World Trade
          Center site and his Work Locations;

          (b)     Plaintiff received inadequate equipment that was entirely inappropriate
          and failed to protect the Plaintiff's health and safety and comply with relevant legal

requirements. For example, the Plaintiff was not provided with or required to use supplied air systems or self contained breathing apparatus (SCBA), even when and where the atmospheric data, properly evaluated, revealed that there were dangerous levels and concentrations of total volatile organic compounds, including but not limited to benzene, that exceeded the legal permissible exposure levels, and that were far beyond the protection limits of any air purifying cartridge respirator;

(c)     Plaintiff was never provided with, or required to use any personal protective equipment that that met the requirements of Level A or B protection, including self-contained breathing apparatus and respirator fit tests, as required by the OHSA HAZWOPER standard, 29 CFR 1910.102;

(d)     Plaintiff was never provided with or required to wear the legally mandated personal protective clothing that would prevent dermal exposures to the hazardous substances present at Plaintiff's Work Locations;

(e)     Plaintiff was never provided with or required to wear the legally mandated eye protection to prevent injuries and/or absorption through the eye membrane of the hazardous substances present in Plaintiff's Work Locations;

(f)     Plaintiff was never provided with or required the required decontamination facilities, equipment and training required to remove the hazardous substances that accumulated on their persons, clothing and personal possessions while working at his Work Locations;

(g)     Any safety equipment provided to Plaintiff by the Avila Defendants, including but not limited to, personal protective equipment and respiratory protection, was not adequately selected, maintained, cleaned, and/or serviced. This included the failure to provide appropriate replacement cartridges for respirators when necessary.

78.     Any respiratory protective equipment the Avila Defendants provided or recommended to Plaintiff was not properly fit tested or otherwise made suitable for use at the World Trade Center site. Among other things, Plaintiff did not receive the legally mandated quantitative and/or qualitative fit-testing and training as required by the Respiratory Protection Standard, 29 CFR 1910.134.

79.     Plaintiff was not provided with the legally mandated safety and health training to ensure his safety at Plaintiff's Work Locations. Among other things:

    (a)     Plaintiff was never provided with or required to attend any HAZWOPER and/or chemical safety and health training before or while performing work at Plaintiff's Work Locations;

    (b)     Plaintiff was never provided with or required to attend any Hazard Communication training before or while performing work at the World Trade Center site;

    (c)     Plaintiff was never provided with or required to attend any WTC site specific safety and health training before or while performing work at the Plaintiff's Work Locations;

    (d)     Plaintiff was never provided with or required to attend any personal protective equipment training before or while performing work at Plaintiff's Work Locations;

    (e)     Plaintiff was never provided with or required to attend any WTC site respiratory protection training before or while performing work at Plaintiff's Work Locations.

80.     The Avila Defendants, their employees, representatives, agents, subcontractors and/or contractors on their own, failed to implement and enforce any and all required environmental and occupational safety and health laws, statutes, standards, regulations, rules

and/or procedures, including, but not limited to, requirements for the use of personal protective equipment, respiratory protection and worker safety and health training.

81.    The Avila Defendants, their employees, representatives, agents, and/or contractors on their own, failed to implement the proper engineering controls, pollution abatement measures, and other operational steps to prevent worker exposure to the myriad of hazardous substances present in the areas where Plaintiff worked and was lawfully present at his Work Locations.

82.    The Avila Defendants, their employees, representatives, agents, and/or contractors on their own, and in conjunction with other parties failed to adopt and implement the required medical surveillance programs for the hazardous substances Plaintiff was exposed to.

## Plaintiff's Injuries

83.    By reason of the foregoing, the Plaintiff was exposed to hazardous substances at his Work Locations.

## Consequential Damages

84.    In consequence of said exposure, Plaintiff sustained severe and permanent personal injuries and/or disability; was rendered sick, sore, lame, and has been maimed and/or disabled; and/or will be permanently caused to suffer pain, suffering, inconvenience, and other effects of such injuries.

85.    In addition, Plaintiff incurred, and in the future will necessarily incur further, doctor, hospital, physical therapy, and/or medical expenses in an effort to diagnose and be cured of said injuries; have been unable to continue, engage in, and/or attend to their usual vocations, and/or activities, and have suffered, and will necessarily suffer additional, loss of time and earnings from employment.

## Fear of Cancer

86.    Plaintiff has a reasonable fear of developing cancer as a result of said exposure. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

87.    Plaintiff will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

88.    The degree of probability that the Plaintiff will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiff to recover here for apprehended consequences that are not presently manifested.

89.    A rational basis exists between Plaintiff's exposure to the aforesaid dust, toxins, and contaminants, and Plaintiff's currently manifested fear of developing cancer in the future.

### Medical Monitoring

90.    As a direct and proximate result of the Avila Defendants' acts, omissions, and conduct as set forth in this Complaint, the Plaintiff has suffered and will continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress. This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of the Plaintiff's health and to monitor their status for changes and progressions in their injuries and their sequelae.

91.    Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death, and as these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

92.     Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible and beneficial. For example, administration of these readily available non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory ailments, and heart dysfunction, even in asymptomatic individuals. Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these patients would suffer if treatment were delayed until their conditions became overtly symptomatic.

93.     The recommended testing procedures will be subject to expert testimony at the time of trial.

94.     Plaintiff is at high risk for latent and progressive respiratory injuries and therefore need to undergo testing. Plaintiff also needs the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of the latent injuries, which will result in even more grave injuries and outcome.

95.     The Plaintiff's increased susceptibility to certain injuries and the irreparable threat to the Plaintiff's future health and well-being resulting from their exposure these hazardous substances and chemicals at Plaintiff's Work Locations can only be mitigated and or addressed by the creation of a medical program including:

    a. Funding further studies of the long-term effects of exposure;

    b. Funding research into possible cures for the detrimental effects of breathing and working with the toxicants produced at the World Trade Center Site;

    c. Gathering and forwarding to treating physicians information related to the diagnosis and treatment of injuries which result from the exposure; and

    d. Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of the Plaintiff.

Role of Avila Defendants

96.    On or about September 11, 2001, and continually thereafter, the Avila Defendants, their employees, representatives, agents, and or contractors were aware of the danger of exposure to dangerous substances, both known and unknown, in the air and dust at Plaintiff's Work Locations.  The Avila Defendants had actual or constructive notice of the dangerous and defective conditions existing at the Work Locations. After September 11, 2001 the Work Locations were not reasonably safe.

97.    The Avila Defendants were negligent in allowing the unsafe condition to exist without warning and this was a substantial factor in causing plaintiff's injuries.

98.    The Avila Defendants knew of the unsafe conditions at Plaintiff's Work Locations long enough before Plaintiff's injuries developed to have permitted them, in the exercise of reasonable care, to have the unsafe conditions corrected and/or warned plaintiff and/or take other suitable precautions. The Avila Defendants did not do so.   To the extent that the Avila Defendants did not know of hazardous conditions on site, in the exercise and use of reasonable care, they should have known of same, and taken steps to correct the conditions and or warn plaintiff.

99.    As set forth below, however, Avila Defendants failed to take adequate measures to inform the Plaintiff of that danger, to take adequate steps to abate or reduce that danger, or to ensure that Plaintiff was provided with the equipment, information, and training necessary for them to avoid or minimize that danger, in violation of their legal duties.

## Causes of Action

B.         **As and For A First Cause of Action: Pursuant to The New York State Labor Law**

100.    Plaintiff repeats, reiterates and realleges each and every other paragraph contained in this Complaint as if set forth more fully at length herein, and further allege the following.

101.    The Avila Defendants, their employees, representatives, agents, and/or contractors had an obligation, in accordance with Section 200 of the Labor Law of the State of New York, to provide a reasonably safe place to work for persons lawfully performing work at Plaintiff's Work Locations. That duty arose from the Avila Defendants' long term ownership, and/or management, and/or control, and/or leasehold, and/or operation, and/or supervision of the Work Locations, together with:

    a.    the Avila Defendants' actual or constructive notice of the dangerous condition of the Plaintiff's Work Locations, as set forth above; and/or

    b.    the Avila Defendants' control or supervision, and/or lack of supervision over some aspects of the work performed at the Plaintiff's Work Locations, as set forth above.

102.    The Avila Defendants violated their duty under Section 200 of the Labor Law by failing to provide a reasonably safe place to work for persons lawfully performing work at their respective buildings. Among other things, the Avila Defendants failed to ensure:

    a.    that the Plaintiff was notified of the dangerous substances in the air, dust, and on the surfaces of their respective buildings;

    b.    that the Plaintiff was provided adequate personal protective equipment, including, but not limited to: protective clothing, masks, respirators, and goggles;

    c.    that the Plaintiff was provided other necessary work equipment, safety devices, and/or apparatus, as well as cleaning supplies and decontamination equipment;

    d.    that adequate workplace safety rules were in place – including rules requiring the use of personal protective equipment – were issued, enforced, and complied with;

    e.    that there was adequate monitoring air quality of their respective buildings before, during and after the commencement of the Plaintiff's work at the site was performed;

    f.    that atmospheric contamination was minimized or avoided;

    g.    that effective engineering controls were implemented at their respective buildings;

    h.    that the conditions at their respective buildings and/or the Plaintiff's particular work areas therein were subject to appropriate safety surveillance and/or inspection;

i.      that the Plaintiff's exposure to dangerous substances, which The
        Avila Defendants knew or should have known would detrimentally
        affect the safety and/or health of Plaintiff, was adequately
        monitored.

103.    As a result of the Avila Defendants' violation of Section 200 of the Labor Law,

the Plaintiff was exposed to dangerous substances and suffered injuries, as set forth herein.

104.    The Plaintiff's injuries are the direct and proximate result of the carelessness,

negligence, gross negligence, wanton, and/or willful disregard and/or acts on the part of the

Avila Defendants, without any fault, want, care, culpable conduct, and/or negligence on the part

of the Plaintiff contributing thereto.

105.    The Avila Defendants are jointly and severally liable with the other defendants in

this case for all of Plaintiff's damages, including, but not limited to Plaintiff's non-economic

loss, irrespective of the provisions of the CPLR §1601, because the Avila Defendants acted

knowingly or intentionally, and in concert, to cause the acts or failures which are a proximate

cause of Plaintiff's injuries (see CPLR §1602(11)) and with reckless disregard for the safety of

others (see CPLR §1602(7)).

### C.      As and For a Second Cause of Action: Pursuant to Labor Law 241(6).

106.    Plaintiff repeats, reiterates and realleges each and every other paragraph contained

in this Complaint as if set forth more fully at length herein, and further allege the following.

107.    As owners, and/or managers, and/or controllers, and/or leaseholders, and/or

operators, and/or supervisors of the Work Locations in the immediate vicinity of the World

Trade Center site, the Avila Defendants, at all relevant times, had a non-delegable duty under

Labor Law §241(6) of the State of New York, to ensure that all areas in which debris removal,

construction, excavation and/or hazardous substance abatement was being performed were so

constructed, shored, equipped, guarded, arranged, operated and conducted as to provide

reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.

108.    The Avila Defendants violated their obligations under Section 241(6) of the Labor Law by failing to ensure that persons frequenting the premises or performing the Work at the Work Locations were provided with a worksite that was so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to such persons.

109.    The Avila Defendants failed to comply with the applicable provisions and requirements of the New York State Industrial Code, including but not limited to §§ 23-1.5, 23-1.7, 23-1.8, 23-1.9, 23-1.25, 23-1.26, 23-2.1; Article 2, §27-a, Article 28, 12 NYCRR §820.4; General Municipal Law of the State of New York, §§205-e, 205-a; The Occupational Safety and Health Act, 29 U.S.C. §§ 654 et. Seq.; Occupational Safety and Health Administration, (OSHA) standards, including but not limited to, 29 C.F.R. §1910 Subparts H, I, J, K and Z, and specifically 29 C.F.R. §§1910.38, 1910.120, 1910.132-134; 1910.146; 1910.156; 1910.1001; 1910.1025; 1910.1027; 1910.1000, and 1910.1200, 29 C.F.R. §1926 Subparts C, D, E, F, G, H, I, J, and Z, and other applicable Federal, State, local, rules, regulations, ordinances and statutes.

110.    As a result of the Avila Defendants' violation of Section 241(6) of the Labor Law, the Plaintiff was exposed to dangerous substances and suffered injuries, as set forth herein.

111.    The Plaintiff's injuries are the direct and proximate result of the carelessness, negligence, gross negligence, wanton, and/or willful disregard and/or acts on the part of the Avila Defendants, without any fault, want, care, culpable conduct, and/or negligence on the part of the Plaintiff contributing thereto.

112.    The Avila Defendants are jointly and severally liable with the other defendants in this case for all of Plaintiff's damages, including, but not limited to Plaintiff's non-economic loss, irrespective of the provisions of the CPLR §1601, because the Avila Defendants:

a.      violated a provision of Article 10 of the Labor Law, specifically Section 241(6) (*see* CPLR 1602(8));

b.      owed the Plaintiff a non-delegable duty of care (*see* CPLR 1602(2)(iv));

c.      are vicariously liable for the negligent acts and omissions of each other and or others who caused or contributed to the plaintiff's damages (*see* CPLR 1602(2)(iv));

d.      acted knowingly or intentionally, and in concert, to cause the acts or failures which are a proximate cause of plaintiff's injuries (*see* CPLR p1602(11)); and

e.      acted with reckless disregard for the safety of others (*see* CPLR 1602(7)).

**D.      As and For a Fifth Cause of Action: Based Upon Common Law Negligence**

113.    Plaintiff repeats, reiterates and realleges each and every other paragraph contained in this Complaint as if set forth more fully at length herein, and further allege the following.

114.    Avila Defendants owed Plaintiff a common law duty to provide a reasonably safe place to work for persons lawfully performing work at the Work Locations, as set forth herein.

115.    Avila Defendants owed the Plaintiff a duty to exercise reasonable care in the actions it undertook at and relating to the Work Locations. This included, among other things, providing information to the Plaintiff regarding the safety of the Work Locations, including the level of dangerous substances in the air and on the site, and the level of risk arising from not properly using personal protective equipment, such as respirators.

116.    Avila Defendants violated their common law duty of due care with respect to the Plaintiff in this case by acting with carelessness, negligence, gross negligence, wanton, and or

willful disregard for the safety and rights of the Plaintiff. Among other things, Avila Defendants violated their duties through the acts and omissions set forth herein.

WHEREFORE, judgment is demanded against Avila Defendants for compensatory damages, jointly and severally with the other defendants in this case, in a sum to be determined by a jury.

### JURY TRIAL DEMAND

Plaintiff demands that all issues of fact in this case be tried to a properly empanelled jury.

Dated: January 2, 2007
      New York, New York

               WORBY GRONER EDELMAN & NAPOLI BERN, LLP
               *Attorneys for Plaintiff*
               *Co-Liaison Counsel*

               By: _____
                   William P. Dubanevich (WD 5969)

               115 Broadway, 12th Floor
               New York, New York 10006
               (212) 267-3700

**Avila Defendants' addresses:**

Brookfield Financial Properties, Inc.
1 Liberty Plaza, 165 Broadway
New York, NY 10006

WFP Tower A. Co., L.P.
1 Liberty Plaza, 165 Broadway
New York, NY 10006

Verizon New York, Inc.
1095 Avenue of the Americas
New York, NY 10036-

## ATTORNEY VERIFICATION

WILLIAM J. DUBANEVICH, an attorney at law, duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury that:

He is the attorney for the plaintiff(s) in the above-entitled action. That he has read the foregoing SUMMONS AND VERIFIED COMPLAINT and knows the contents thereof, and upon information and belief, deponent believes the matters alleged therein to be true.

The reason this Verification is made by deponent and not by the plaintiff(s) is that the plaintiff(s) herein reside(s) in a county other than the one in which the plaintiff's attorneys maintain their office.

The source of deponent's information and the grounds of his belief are communication, papers, reports and investigation contained in the file.

DATED:    New York, New York
          January 2, 2007


                                    _____
                                    WILLIAM J. DUBANEVICH

Docket No.:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

================================================================

ANGEL AVILA AND AMMSY AVILA,

Plaintiff(s)

- against -

BROOKFIELD FINANCIAL PROPERTIES, INC., et al.

Defendant(s).

================================================================

SUMMONS AND VERIFIED COMPLAINT

================================================================

**WORBY GRONER EDELMAN & NAPOLI BERN, LLP**

*Attorneys for:* Plaintiff(s)
*Office and Post Office Address, Telephone*
115 Broadway - 12th Floor
New York, New York 10006
(212) 267-3700

================================================================

To
Attorney(s) for

================================================================

Service of a copy of the within

is hereby admitted.

Dated,

Attorney(s) for

================================================================

PLEASE TAKE NOTICE:
G **NOTICE OF ENTRY**
        that the within is a (certified) true copy of an
        duly entered in the office of the clerk of the within named court on          20
G **NOTICE OF SETTLEMENT**
        that an order                                        of which the within is a true copy
will be presented for settlement to the HON.                 one of the judges of the
        within named Court, at
        on                      20            at            M.
        Dated,

Yours, etc.,

WORBY GRONER EDELMAN & NAPOLI BERN, LLP

================================================================